# Exhibit C

Dockets.Justia.com

Slip Copy
Slip Copy, 2009 WL 816327 (S.D.Ohio)
**(Cite as: 2009 WL 816327 (S.D.Ohio))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Eastern Division.
Lucinda S. ARNOLD, et al., Plaintiffs,
v.
PETLAND, INC., et al., Defendants.
No. 2:07-cv-01307.

March 26, 2009.

Gregory H. Melick, Heather L. Melick, Matthew T. Anderson, Luper Neidenthal & Logan, Columbus, OH, for Plaintiffs.

Matthew S. Schmidt, Nusbaum Ater Schmidt & Wissler, LLP, Chillicothe, OH, Carmen D. Caruso, Jeremy P. Kreger, Stahl Cowen Crowley Addis LLC, Chicago, IL, Robert G. Cohen, Kegler Brown Hill & Ritter, John Patrick Mazza, Lee W. Westfall, Harris Turano & Mazza, Columbus, OH, for Defendants.

*OPINION AND ORDER*

MICHAEL H. WATSON, District Judge.

***1** This case concerns a pet store franchise. Plaintiffs bring this action under the Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Plaintiffs also assert state law claims for violation of Ohio's statutory antitrust laws, fraud, breach of contract, breach of implied contract, negligent misrepresentation, and breach of implied and express warranties.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(6) and (1). (Doc. 14). For the following reasons, the Court grants defendants' motion to dismiss in part and denies it in part.

**I. Facts**

The Court derives the following facts from plaintiffs' amended complaint. The Court accepts these facts as true for purposes of ruling on defendants' motion to dismiss.

Plaintiffs Lucinda S. Arnold and Fred J. Arnold (collectively "Arnolds" or "plaintiffs") are individual citizens of the State of Ohio. The Arnolds had a partnership in Marietta, Ohio for the purpose of opening and operating a Petland franchise.

Defendant Petland, Inc. ("Petland") is an Ohio corporation with its principal place of business in Chillicothe, Ohio. Petland is a franchisor in the pet and pet supply industry.

Defendants Hunte Kennell Systems & Animal Care, Inc. and Hunte Delivery System, Inc. (collectively, "Hunte") are in the business of supplying puppies to pet stores, and have their principal place of business in Missouri. Hunte is a preffered supplier of puppies to Petland, and supplied puppies to the Arnold's Petland franchise.

In about 2004, the Arnolds noticed an advertisement in a local newspaper concerning the opening of a Petland franchise in Marietta. The Arnolds responded to the advertisement and spoke with Petland representatives about purchasing the franchise. The franchise would have required an initial capital investment of $750,000 to $850,000, and the Arnolds decided not to pursue the matter further at that time. Petland built the Marieta store, however, and ran it as a corporate store until it found a franchisee to take over the operation.

Some time later, Petland contacted the Arnolds and offered to sell them the Marietta store for over $400,000. The Arnolds made a counteroffer, which Petland refused. In November 2006, the Marietta Petland closed for business. About a month later, Petland representative Jimmy Taylor contacted the Arnolds, offering to sell them the Marietta franchise as an existing, turn-key business. Petland represented to the Arnolds that the store was ready to open, requiring only a $20,000 to $25,000 investment in inventory.

The Arnolds investigated the offer, negotiated with Petland, and on February 28, 2007 entered into a franchise agreement with Petland. Under the franchise agreement, the Arnolds paid Petland an initial franchise fee of $12,500. Under a separate asset purchase agreement, the Arnolds bought the store's fixtures, equipment, inventory, and related assets for $110,000. The Arnolds paid another $50,000 to open the store, and spent an additional $50,000 to keep the store open for just over six months.

**\*2** Responding to pressure from Petland, the Arnolds held the grand opening for the Marietta store on March 31, 2007. Prior to the opening, Petland placed an order for puppies for the grand opening through it's preferred supplier, Hunte. The puppies were sick from the very outset. Customers who purchased these puppies returned them within days. Two of the first puppies sold during the grand opening die d from parvo and/or viral enteritis within days of sale. A third puppy from the initial Hunte order also died. The remaining puppies all showed symptoms of illness, requiring the Arnolds to obtain veterinary care for them at the Arnold's substantial expense. Customers also purchased pet food from the store's existing inventory. The customers soon began returning the pet food for full refunds because the expiration date for the food had passed. Other pet food was returned because it contained maggots. The Arnolds aver the problems with the sick puppies and expired food significantly harmed the store's bottom line as well as its reputation in the community. The Arnolds also faced problems with the store's Point-of-Sale ("POS") register system, which malfunctioned during the entire six-plus months the store was open. The system apparently crashed at times and would not accept credit card transactions after 8:00 p.m. Finally, the store's air conditioning and ventilation system was defective, which exacerbated the problems with the sick Hunte puppies.

The Arnolds allege that as a result of the aforementioned problems, by September 2007, the Marietta franchise was in deep financial trouble. For this reason, the Arnolds contacted Petland in an effort to obtain financial assistance from Petland's preferred lenders. Petland COO Greg Hudson informed the Arnolds that no financial help would be forthcoming from Petland. Instead, Hudson advised the Arnolds to stop paying their vendors, and to pay only the bank, the landlord, and Petland. Hudson warned the Arnolds that if they stopped paying franchise fees, Petland would "eat them for lunch." The Arnolds say that financial difficulties forced them to close the Marietta store on October 13, 2007.

The Arnolds maintain that Petland knowingly and deliberately made numerous misrepresentations to them in order to induce them to purchase the Marietta franchise. Specifically, Petland represented that it would cost the Arnolds only $20,000 to $25,000 for additional inventory to open the store, when in fact Petland knew the Arnolds would also have to spend an additional $25,000 to purchase animals. In addition, Petland repeatedly told the Arnolds the financials for the last two months of the prior franchisee's operation of the store were "very strong," but the Arnolds later discovered that the actual performance of the store during that period was well below what Petland had represented. Furthermore, Petland provided the Arnolds false and misleading information regarding the store's then-current inventory by failing to inform them that thousands of dollars worth of pet food on the shelves had ex-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

pired, with some infested with maggots, making the inventory unmerchantable and worthless. Moreover, Petland mislead the Arnolds by telling them that the prior Marietta franchisee failed due to poor management, when in fact Petland knew the earlier franchise failed because of problems with sick puppies, inadequate air conditioning and ventilation, and the defective POS system.

**\*3** The Arnolds filed the instant lawsuit on December 31, 2007. Their first complaint asserted only state law claims. Given that the Arnolds are Ohio citizens, and that Petland is an Ohio corporation, January 30, 2008, defendants moved to dismiss the action for lack of diversity of citizenship. (Doc. 5). The Arnolds responded on April 25, 2008 by filing an amended complaint, in which they assert the following claims:

Count I-illegal tying under § 1 if the Sherman Act (15 U.S.C. § 1) as to defendant Petland

Count II-conspiracy to commit illegal tying under § 1 of the Sherman Act (15 U.S.C. § 1) as to defendants Petland and Hunte

Count III-civil RICO (18 U.S.C. § 1962(c)) as to defendant Petland

Count IV-violation of Ohio antitrust law, Ohio Rev.Code § 1331.01 *et seq.* As to defendants Petland and Hunte

Count V-fraud as to defendant Petland

Count VI-fraud in the inducement as to defendant Petland

Count VII-breach of express contract as to defendant Petland

Count VIII-breach of implied contract as to defendant Petland

Count IX-negligent misrepresentation as to defendant Petland

Count X-violation of implied and express warranties of merchanability as to defendant Hunte

(Doc. 10). Defendants thereafter filed a second motion to dismiss in which they argue that plaintiffs' federal antitrust and RICO claims fail to state a claim upon which relief can be granted, and that the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims. (Doc. 14).

### II. Motion to Dismiss

Defendants move in part to dismiss plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Supreme Court has explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level ...." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal citations omitted). Nonetheless, the Supreme Court has also made clear that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Twombly,* 127 S.Ct. at 1964). Moreover "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."*Id.* (citing *Twombly,* 127 S.Ct. at 1965).

Additional considerations apply in antitrust cases. On the one hand, the Court must be cautious in dismissing an antitrust claim prior to discovery.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Twombly,* 127 S.Ct. at 1966-67. On the other hand, the Court must be mindful that discovery in an antitrust action can be expensive." *Id.* at 1967.

**\*4** Furthermore, plaintiffs assert mail and wire fraud as the predicate acts for their RICO claim. The claim is therefore subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b).*See Brown v. Cassens Trans. Co.,* 546 F.3d 347, 356 n. 4 (6th Cir.2008).Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."Fed.R.Civ.P. 9(b). A complaint satisfies Rule 9(b) particularity requirement for fraud if it alleges: the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendant; and the injury resulting from the fraud. *U.S. ex rel. Poteet v. Medtronic, Inc.,* 552 F.3d 503, 518 (6th Cir.2009). In addition, even when a plaintiffs RICO allegations fail to satisfy the particularity requirement, the Court may allow discovery to proceed under Fed.R.Civ.P. 11(b)(3).*See Brown,* 546 F.3d at 356 n. 4; *Rotella v. Wood,* 528 U.S. 549, 560, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (In RICO action Rule 11(b)(3) provides "flexibility to allow pleadings based on evidence reasonably anticipated after further discovery."); *accord Michaels Building Co. v. A merit rust Co.,* 848 F.2d 674, 679-81 (6th Cir.1988).

### III. Discussion

Defendants seek dismissal of plaintiffs' antitrust and RICO claims, arguing plaintiffs have failed to state a claim upon which relief can be granted. Furthermore, defendants contend that since plaintiffs' federal claims must be dismissed the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims.

### A. Antitrust

Section 1 of the Sherman Act provides: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."15 U.S.C. § 1. Plaintiffs in the instant case assert a type of antitrust violation known as "tying." The U.S. Supreme Court has defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). For example, "[a] supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as the *tied* product." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 33, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring) (emphasis in original), *abrogated on other grounds, Illinois Tool Works, Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).

A plaintiff asserting a claim of illegal tying must allege: (1) the seller has appreciable economic power in the tying product market; (2) the tying arrangement affects a substantial volume of commerce in the tied market; (3) the seller has a direct economic interest in the sale of the tied product; and (4) the plaintiff has suffered antitrust injury as a result of the tying arrangement. *CTUnify, Inc. v. Nortel Networks, Inc.,* 115 Fed. Appx. 831, 834 (6th Cir.2004).

**\*5** Defendants advance three grounds for dismissal of plaintiffs' tying claims: (1) plaintiffs have incorrectly defined the relevant product market; (2) plaintiffs have not and cannot allege that defendant Petland has sufficient market power; and (3) plaintiffs have not and cannot allege that Petland

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

has a direct economic interest in the alleged tied products. The Court finds it unnecessary to address the third argument, as the first two are clearly dispositive.

### 1. Relevant product market

Defendants first argue that the Court must dismiss plaintiffs' antitrust claims because plaintiffs have improperly defined the relevant tying product market. Plaintiffs aver that the relevant product market is the market for pet store franchises.

For the proposition that plaintiffs have failed to plead the relevant product market, defendants' rely upon the decision of the district court in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F.Supp. 1055, 1064 (E.D.Pa.1996), *aff'd,* 124 F.3d 430 (3d Cir.1997). The plaintiffs in *Queen City* were individual franchisees of Domino's pizza stores as well as an organization formed to represent franchisees. The plaintiffs alleged that Domino's used provisions of the franchise agreements to force the franchisees to purchase pizza ingredients and supplies, such as dough, at inflated prices from a Domino's subsidiary, thereby preventing the franchisees from obtaining ingredients at competitive prices from other sources. The plaintiffs asserted this conduct amounted to an illegal tying arrangement in violation of § 1 of the Sherman Act.

The defendant in *Queen City* moved to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, arguing that the plaintiffs failed to allege a relevant product market, and that to the extent the plaintiffs maintained the relevant product market was the market for ingredients and supplies among Domino's franchisees, the market definition was incorrect as a matter of law. The district court granted the motion to dismiss, holding that the market the plaintiffs identified arose from the contractual power Dominos exercised under the franchise agreement, and therefore did not support an antitrust claim. *Queen City,* 922 F.Supp. at 1062.

The district court in *Queen City* recognized that the relevant market is determined by examining the cross-elasticity of demand, or, the degree to which a rise in the price of the product creates a rise in the demand for like products in that market. *Id.* at 1061.It drew a sharp distinction between a franchisor's pre-contractual market power versus the post-contractual power the franchisor possesses under the franchise agreement. *Id.* at 1061.The district court embraced the concept, posited by two commentators, that the post-contractual power a franchisor derives from a franchise agreement "has nothing to do with market power, ultimate consumers' welfare, or antitrust."*Id.* at 1062 (quoting Benjamin Klien & Lester Saft, *The Law and Economics of Franchise Tying Contracts,* 28 J.Law & Econ. 345, 356 (1985)). Applying this principle, the district court held that "antitrust claims predicated upon a 'relevant market' defined by the bounds of a franchise agreement are not cognizable."*Id.* at 1063.The district court further rejected the plaintiffs' contention that a contrary result was required under the U.S. Supreme Court's decision in *Eastman Kodak. Id.* at 1062-63.The district court distinguished *Eastman Kodak* on the ground that *Eastman Kodak* turned upon the unique nature of Kodak's copy equipment. *Id.* On appeal, the Third Circuit affirmed the judgment of the district court. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 444 (3d Cir.1997).

**\*6** The *Queen City* decisions rest on the principle that a product market cannot be defined by contractual restraints on the plaintiff franchisee. In *Queen City,* the plaintiffs ostensibly defined the relevant market as the market for ingredients and supplies among Domino's franchisees, which they were obligated to purchase under the terms of the franchise agreements. Here, in contrast, plaintiffs do not restrict their relevant market allegations to the market for goods and services associated with the operation of a Petland Franchise. Rather, plaintiffs identify

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the relevant tying product market as the market for pet store franchises. Dicta aside, neither *Queen City* decision compels the conclusion that the market for pet store franchises is not the relevant market in the instant case.

Defendants nonetheless argue that the relevant market in this case is, at the narrowest, the market for retail franchises. They maintain the market for pet store franchises is fatally narrow because it fails to include all equivalent investment opportunities. In support of these arguments, defendants cite *Westerfield v. Quizno's Franchise Co.,* 527 F.Supp.2d 840, 857 (E.D.Wis.2007), *vacated in part on other grounds,* No. 06-C-1210, 2008 WL 2512467 (E.D.Wis. Apr.16, 2008). The court in *Westerfield* observed that the relevant product market includes " 'all products that have reasonable interchangeability for the purposes for which they are produced-price, use, and qualities considered.'"*Id.* at 857 (quoting *United States v. E.I. Dupont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). It further concluded that "[i]n the area of franchises such as Quiznos, the relevant product market would include equivalent investment opportunities."*Id.*

> From the perspective of sound analysis and consistency with the fundamental legal principle, it is patent that-at the minimum-a franchisor market power assessment requires reference to all alternatives available to the potential consumer in a broad line of business endeavors. In many cases this will extend to the market for franchises of all types or the employment of capital. For market power to exist there must be something that shows that, pre-contract, the seller had the power to force a potential franchisee to purchase something that would not have occurred in a competitive market-a requirement drawn directly from *Jefferson Parish.*

*Id.* (quoting Alan Silberman, *Myths of Franchise "Market Power",* 65 Antitrust L.J. 181, 206

). The plaintiff franchisees in *Westerfield* asserted that the relevant product market was the market for "Quick Service Toasted Sandwich Restaurant Franchise[s]"*Id.* at 858.The *Westerfield* court found this assertion to be "patently absurd," explaining:

> It may well be that Quiznos holds substantial market power for those investors who wish to purchase a fast food franchise that sells toasted submarine sandwiches. But that's like saying that the seller of any franchise known for a particular product has market power over investors who are already determined to sell such a product. That cannot be the test. The mere fact that a particular franchise is known for a unique product and way of doing business does not show market power over investors.

**\*7** *Id.* The Court agrees with this analysis. The purpose of a Petland franchise, as a product, is not to have a retail store with goldfish and puppies. Rather, its purpose, as well as that of any franchise, is to make money for the franchisee. It is, in the final analysis, an investment opportunity. Any number of other products created for the same purpose would be reasonably interchangeable. Plaintiffs confirm this when they allege that some time in 2004 they "first became aware of an *investment opportunity* in Petland .... (Am.Compl.(Doc.10) ¶ 8) (emphasis added). A Petland franchise is but one of many investment opportunities plaintiffs could have pursued. Equivalent investment opportunities would at least include other retail store franchises, and perhaps non-franchise retail stores. As the courts in *Queen City* and *Westerfield* suggest, plaintiffs need not have become Petland franchisees because a myriad of other equivalent opportunities were available. For these reasons, the Court finds that plaintiffs have failed to allege the relevant product market. Consequently, plaintiffs' antitrust claims are subject to dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

### 2. Market power

Defendants next contend that plaintiffs' antitrust claims are subject to dismissal because plaintiffs have not and cannot allege that Petland has sufficient market power to force the tying of other products to the purchase of a franchise. Plaintiffs argue that they adequately pleaded market power by alleging that Petland is the only full-service pet store franchise listed among Entrepreneur's Franchise 500 top retail pet franchises in 2007, and that Petland ranked number 182 in the annual "Top 200" franchisors in the United States as determined by Franchise Times magazine. (Am.Compl.(Doc.10) ¶ 36).

Not every instance of tying constitutes an antitrust violation. *Jefferson Parish,* 466 U.S. at 11. For example, " 'if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition if its competitors were ready and able to sell flour by itself.'" *Id.* at 12 (quoting *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). For this reason, a tying arrangement is not illegal unless the seller has "some special ability-usually called 'market power'-to force a purchaser to do something that he would not do in a competitive market." *Id.* at 13-14.

*Jefferson Parish* involved an action by a plaintiff anesthesiologist against a hospital which had an exclusive relationship with an anesthesiologist group to which the plaintiff did not belong. The defendant hospital had a thirty percent share of the relevant market. The Court held that such a market share was insufficient to show the kind of market power required to make a tying arrangement unlawful. *Id.* at 26-27.

**\*8** Here, the Court has concluded that the relevant market encompasses at least the market for franchises in general, and perhaps even similar non-franchise investment opportunities. The food store example from *Jefferson Parish* is apt-Petland clearly lacks the requisite market power because plaintiffs were free to invest in any number of other franchises or even to choose among many available non-franchise investments. Petland's position in the relevant market is similar to that of the one store out of a dozen that sold flour only to buyers who would also purchase sugar. The Court finds that plaintiffs have not, and cannot, plead that Petland has sufficient market power in the relevant tying product market to force plaintiffs to purchase the tied products.

As an alternative basis for its ruling, however, the Court will also analyze market power assuming, *arguendo,* that the relevant market is the market for pet store franchises. Plaintiffs' allegations of market power fail even under this assumption. Plaintiffs assert that Petland is the only full-service pet store franchise listed among Entrepreneur's Franchise 500 top retail pet franchises in 2007. Even viewed in the light most favorable to plaintiffs, this assertion falls far short of establishing the kind of market power that renders tying an antitrust violation. The statement indicates that Petland is the only "full-service" pet store on the list of top retail pet franchises. This statement unmistakably implies that other pet store franchises which are not "full-service" are also on the list. If the relevant market is the market consisting of all pet store franchises, then Petland is only one of several or many competing pet store franchises available to investors.

Plaintiffs also allege that Petland ranked number 182 in the annual "Top 200" franchisors in the United States as determined by Franchise Times magazine. This allegation is so abstract as to be meaningless. Even viewed in the most favorable light, there is simply no basis to equate a ranking of 182 out of 200 with dominant market power.

Based on the above discussion, the Court concludes that plaintiffs have failed to adequately plead that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Petland has dominant market power in the relevant product market. For this additional reason, defendants are entitled to dismissal of plaintiffs' antitrust claims.

### B. RICO

Plaintiffs bring their civil RICO claim under 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*Id.* Any person injured by a violation of § 1962(c) may bring a civil action under that section to recover treble damages, attorney's fees, and costs. 18 U.S.C. § 1964(c).

**\*9** Defendants contend the Court must dismiss plaintiffs' RICO claim, Count III, because plaintiffs have not and cannot plead any specific instances of misrepresentations made through mail or wire, and because plaintiffs cannot plead a pattern of racketeering.

### 1. Predicate offenses: mail and wire fraud

Defendants argue that plaintiffs' RICO claim fails because plaintiffs have not pleaded the predicate acts with requisite particularity, and because plaintiffs have not pleaded specific misrepresentations that were made by mail or wire. Plaintiffs maintain they have pleaded numerous specific instances of misrepresentations, and that they need not plead that the misrepresentations were made by mail or wire, but only that the scheme to defraud involved the use of mail or wire.

The amended complaint is replete with allegations of specific misrepresentations made with knowledge of their falsity and with fraudulent intent. (Am.Compl.(Doc.10) ¶¶ 11, 25-33, 58-66, 69-75). Defendants appear to suggest that allegations appearing in the complaint after the RICO claim (¶¶ 47-53) should not be considered. This argument lacks substance. The later allegations incorporate the earlier ones by reference. Hence, the RICO claim itself is incorporated in the later allegations. In any event, the Court would not dismiss plaintiffs' RICO claim with prejudice on the basis of such a trivial defect, which could readily be cured by amendment.

Plaintiffs are also correct in asserting that the mail and wire fraud statutes do not require them to plead instances of misrepresentations made via mail or wire.

The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud. Mail fraud, in turn, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." § 1341. The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States,* 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.,* at 715, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734.

*Bridge v. Phoenix Bond & Indem. Co.,* --- U.S. ----, ----, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008). Thus, whether plaintiffs have alleged specific instances of mail and wire communications which contain misrepresentations is of no con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sequence.

For the above reasons, the Court declines to dismiss plaintiffs' RICO claim on the ground that plaintiffs have not pleaded the underlying scheme to defraud with particularity or on the ground that plaintiffs have failed to plead any specific instances of misrepresentations made through mail or wire.

### 2. RICO pattern requirement

**\*10** Defendants also assert that plaintiffs' RICO claim must be dismissed because plaintiffs have failed to plead a pattern of racketeering activity. Specifically, defendants contend that plaintiffs have, at most, pleaded a single scheme to defraud which took place over an eleven month period. Plaintiffs argue they have sufficiently pleaded the pattern element by alleging multiple instances of mail and wire fraud. Plaintiffs also point out that they allege, based upon information and belief, that Petland has used the same scheme against other past and present franchisees. (Am.Compl.(Doc.10) ¶ 52).

RICO requires proof of a "pattern of racketeering activity." 18 U.S.C. § 1962; *H.J., Inc. v. Nw Bell Tel. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Brown v. Cassens Trans. Co.,* 546 F.3d 347, 353 (6th Cir.2008). RICO provides that " 'a pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Although two predicate acts are required, they do not necessarily establish a pattern. *H.J., Inc.,* 429 U.S. at 237. Rather, to demonstrate a pattern, a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."*Id.* at 239 (emphasis in original). The relatedness component is satisfied if the predicate criminal acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 240 (quoting 18 U.S.C. § 3575(e)). To prove a pattern a plaintiff must, in addition to relatedness, show continuity:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. See *Barticheck v. Fidelity Union Bank/ First National State,* 832 F.2d 36, 39 (C.A.3 1987). It is, in either case, centrally a temporal concept-and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. See S.Rep. No. 91-617, at 158.

**\*11** *Id.* at 241-42 (emphasis in original).

Defendants assert that plaintiffs have failed to plead a pattern of racketeering activity because plaintiffs have, at most, pleaded a single scheme to defraud which took place over an eleven month period. In part, plaintiffs plead a closed period that lasted only about eleven months. By itself, the predicate acts taken against plaintiffs over an eleven month period do not constitute a "series of related predicates ex-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tending over a *substantial period of time."Id.* at 242 (emphasis added); *Vemco, Inc. v. Camardella,* 23 F.3d 129, 133-34 (6th Cir.1994) (single scheme spanning seventeen months did not satisfy continuity requirement).

But plaintiffs' pleading is not limited to a single scheme. Rather, plaintiffs also allege that Petland has used the same scheme to victimize other past and present Petland franchisees. Defendants contend, without citation to authority, that such an allegation "is far too weak to establish a RICO pattern."(Reply (Doc. 25) at 6). The Court disagrees. At this point, the Court may take judicial notice that other franchisees have brought actions in this Court against the same defendants, asserting similar factual allegations and claims. The Court finds that these related cases support plaintiffs' assertion that Petland has employed the same scheme against multiple franchisees over a substantial period of time. Stated another way, the existence of the other cases bolsters the plausibility of plaintiffs' allegations pertaining to relatedness and continuity. The Court holds that plaintiff has alleged sufficient facts to satisfy both the relatedness and continuity components of the RICO pattern requirement.

For the above reasons, the Court declines to dismiss plaintiffs' RICO claim against Petland.

### C. State law claims

Lastly, defendants argue that because plaintiffs' federal claims must be dismissed, the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims. Since the Court has determined that plaintiffs' RICO claim is not subject to dismissal under Fed.R.Civ.P. 12(b)(6), the Court will continue to exercise supplemental jurisdiction over plaintiffs' state law claims.

### IV. Disposition

For the above reasons, the Court **GRANTS** defendants' motion to dismiss in part and **DENIES** it in part. (Doc. 14). The Court dismisses plaintiffs' antitrust claims with prejudice. All other claims remain pending.

**IT IS SO ORDERED.**

S.D.Ohio,2009.
Arnold v. Petland, Inc.
Slip Copy, 2009 WL 816327 (S.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.